ARCHIBALD D. MOORE *et ux.*, appellants, *v.* CHARLES W. HUNTER *et al.*, appellees.

*Appeal from Madison.*

A Court of Equity ought to be fully convinced, by clear and incontrovertible testimony, before they subvert a long standing legal title, accompanied by possession. The random recollections of one or two witnesses, of some expressions dropped casually by the original purchaser between twenty three and thirty years previously, ought not to be the basis of destroying a regular legal title, derived from the Government. The common assurances of the country, the legal evidence to title to real estate would be of little value, if they could be thus shaken.

A doubt must be converted into something like a certainty before a Court of justice would be justified in breaking down a regular chain of title.

One who purchases without notice of an equity, is not affected by such equity.

Every purchaser is presumed to have notice of any defect of title, apparent upon the face of his Patent; but he is not required to look for a latent defect in the chain of assignments recited in the Patent, where such assignments purport to have been made by the proper person.

A Patent affords a legal presumption that it was properly issued, if it is regular on its face, and upon which it is safe for subsequent purchasers to rely.

The United States are the owners of all the vacant lands in this State, and until they are sold, and the price stipulated to be paid for any particular tract of land belonging to them, is received, the Recording Acts of this State have no application.

The recording of a deed, not required by law to be recorded, is not notice to any one.

If the complainant in a bill waive the oath of the defendant, and the defendant files his answer under oath, the Court will give no further effect to such answer, than if it had not been sworn to.

THIS was a suit in Chancery brought by Archibald Moore and Betsy Moore, his wife, the appellants, against Charles W. Hunter and William Russell, the appellees, in the Madison Circuit Court, to establish a title. The cause was heard before the Hon. James Shields, at the November term of said Court, 1843, on the bill, answers, depositions, and exhibits, and a final decree rendered, denying the prayer of the bill, and dismissing the same at the costs of the complainants. From that decree they appealed to this Court. The facts upon which the decision of this Court is based, appear in the Opinion.

*J. Gillespie* and *L. Trumbull* for the appellants:

I.   The principal and disputed facts in this case, are, whether Easton procured the Patent for the benefit of John Bates, deceased, and whether Russell and Hunter had notice of that fact at the times of their purchases.   In support of the position that Easton procured said Patent for the benefit of Bates, complainants refer:

*First.*   To the copy of the record from the General Land Office, filed by Russell with his answer.

*Secondly.*   To the depositions of Levi McNeil, Solomon Pruitt, and James W. Whitney.

II.   That Bates furnished the money to enter the land is further proved by the fact that Meacham, whom Russell avers in his answer, was the agent through whom the land was entered by Dunnegan, afterwards purchased of Bates, for a valuable consideration; also, by the further fact, that he was witness to the receipt from Easton to Dunnegan.

The land being entered by Easton, in his own name, but with the money of Bates and for Bates' benefit, a trust results in favor of Bates.   2 Johns. Ch. R. 409; 2 Sugden on Vendors, 175; 2 Story's Eq. Jur. 456, 458.

III.   That Russell had notice may be inferred,

*First*, from the fact that he answers evasively, and does not state the amount of consideration paid, the time of payment, nor does he deny the circumstances from which notice may be inferred.   *Boone* v. *Childs*, 10 Peters, 211, 212; *Moore* v. *Scott*, 3 Scam. 316, 317, 321; 2 Sugden on Vendors, 300, note.

*Second*, by the depositions of Bartlett and Starr, showing that Russell was engaged with Easton in speculating in lands about Alton.

*Third*, the fact that Bates lived and died upon the land, and that Hunter, claiming through Bates, was in possession of the same at the time of the purchases by Russell, was notice of Bates' title.   Possession of premises is notice to a purchaser of the possessor's title, both legal and equitable.   *Daniels* v. *Davidson*, 16 Vesey, 254; *Johnston* v. *Glancy*, 4 Blackf. 96; *Moreland* v. *Lemasters*, Ib. 386; *Jackson* v. *Post*, 9 Cowen 9; *Tuttle* v. *Jackson*, 6 Wend. 213; *Spofford* v. *Manning*,

6 Paige, 383; *Buck* v. *Holloway's Devisees*, 2 J. J. Marsh. 180; *Brown* v. *Anderson*, 1 Monroe, 201; *Governeur* v. *Lynch*, 2 Paige, 300.

*Fourth*, the conveyance from Gamble to Russell, from Easton to Russell, and from Russell to Hunter, are all just quitclaims, and contain expressions evidently showing that the parties knew there was doubt about the title. *Porter* v. *Noyes*, 2 Greenl. 26; 1 Story's Eq. Jur. 387.

*Fifth*, the deed from Dunnegan to Bates, duly recorded in 1815, that from Bates to Meacham and the mortgage back to Bates, were full and perfect notice to Russell of Bates' title. *Doyle* v. *Teas*, 4 Scam. 202.

All deeds in any way affecting lands either in law or equity, were required to be recorded. 2 Ter. Laws, 570.

A registered deed is notice to all the world. *Deck* v. *Balch*, 8 Peters, 38; 1 Story's Eq. Jur. 392; *Doyle* v. *Teas*, 4 Scam. 202; 1 Johns. Ch. R. 398.

Whatever is sufficient to put a party on inquiry is good notice. *Stephenson* v. *Smith*, 7 Missouri, 617; 2 Sugden on Vendors, 290.

An equitable right, which originated before the date of the Patent, may be examined. *Moreland* v. *Lemasters*, 4 Blackf. 383; *Stephenson* v. *Smith*, 7 Missouri, 610; *Brush* v. *Ware*, 15 Peters, 105, 107; *Reeder* v. *Barr*, 1 Ohio Cond. R. 852; *Graves* v. *Graves*, 1 A. K. Marsh. 165.

The general doctrine of notice applies as well to equities existing prior to the emanation of a patent, as to other cases. *Brush* v. *Ware*, 15 Peters, 93, 109; *Stephenson* v. *Smith*, 7 Missouri, 610.

A purchaser of land granted to a person as assignee is bound to take notice, whether the assignee had power to convey. *Reeder* v. *Barr*, 1 Ohio Cond. R. 852; *Brush* v. *Ware*, 15 Peters, 111.

Gamble, being a purchaser at sheriff's sale, and not by *deed*, took the title, if at all, as held by the debtor, subject to prior existing liens, and notice, as to him, was not necessary. Acts of 1819, 178, §2; 7 Peters, 561, 562; Ib. 271; *Robinson* v. *Rowan*, 2 Scam, 499; *Riddle* v. *Bryan*, 5 Ohio, 32; *Jackson* v. *Anderson*, 4 Wend. 481; *Same* v. *Post*, 9 Cowen, 120.

IV.   In answer to the defence set up by Hunter, under his title derived from Bates through Meacham, the complainants insist,

*First.*   That there is no proof that John Bates ever executed a covenant as stated in the answer of said Hunter. The answer in this respect not being responsive to the bill, cannot be received as evidence of the execution of said instrument; said writing is not under seal and does not itself constitute a release, and the administrator of Bates had no power to execute a release for a part of the mortgaged premises.   *U. S. Bank.* v. *Piatt's Heirs,* 5 Ohio, 347.

*Second.*   The last clause of said alleged covenant by Bates, expressly limits the right to release to the time when the money fell due upon the mortgage; consequently the administrator had no right after that time to execute said release in favor of said Hunter.

*G. T. M. Davis, N. D. Strong,* and *W. Martin,* for the appellees:

I.   The effect of the amended bill.   We insist that the amended bill is part of the original bill, as it does not include material allegations that are contained in the original.   That a waiver of the answers on oath to the amended bill does not dispense with an answer under oath to the original bill; especially as the appellees have answered the original as well as the amended bill, and upon those answers the complainants took issue by filing their replications.   1 Smith's Ch. Pr. 198, 293, 297; *Hurd* v. *Everett,* 1 Paige, 124; *The Bennington Iron Co.* v. *Campbell,* 2 do. 161, 162; *Luce* v. *Graham,* 4 Johns. Ch. R. 171-3; 1 Peters' Dig. 453; Cooper's Eq. Pl. 322.

II.   That the allegations in the bill and the proofs taken in the cause must correspond and sustain each other to authorize a decree by the Court.   In the case at bar, the allegations are not sustained by proof, but on the contrary, the proofs attempt to make out a case not contained in the pleadings. 1 Smith's Ch. Pr. 346; 3 Johns. Ch. R. 355, 356; 9 Peters, 501-3; 10 do. 208, 209.

III.   That a *bona fide* purchaser without notice of a latent

equity is protected. In this case, the answers of both Russell and Hunter deny all notice whatever, directly or indirectly, and allege that they were innocent purchasers for a good and valuable consideration without notice. The proofs in this case making out neither notice or fraud, the decree of the Court below should be affirmed. 2 Sugden on Vendors, 274, 275; 3 Johns. Ch. R. 147; 1 do. 573, 574; 8 do. 140, 141; 9 do. 163; *Ferrars* v. *Cherry,* 2 Vernon, 384.

IV. A purchaser *with notice* deriving title from one without notice is protected in his purchase. The bill alleges that Archibald Gamble purchased the land in question at a sheriff's sale upon an execution in favor of the Bank of St. Louis against Rufus Easton, but no where charges that Gamble *had any notice,* either actual or constructive, of any adverse title either in law or equity, nor is there any proof whatever showing that Gamble had any such notice. The defendant, Russell, derives his title under Gamble; admitting, therefore, for the sake of argument, that Russell had notice of the latent equity in Bates, having purchased from Gamble who was a *bona fide* purchaser *without notice,* is protected in that purchase as well as all those who claim under him. 1 Eq. Cases Abr. 331; 1 Johns. Ch. R. 213; 2 Sugden on Vendors, 313, 314.

V. It was not necessary for Russell, as is contended by the counsel for appellants, to set out the consideration paid by him for the purchase of the land in controversy, for the reason, *first:* that he is no where called upon either in the original or amended bill to state what consideration he paid for the land; and, *second:* because the appellants make an exhibit of the deed from Gamble and wife, and Easton to Russell, which upon their face show a good, valid and sufficient consideration. The same may be said of Hunter, who claims as well through Russell as Meacham. 2 Sugden on Vendors, 806, 807.

VI. That the fee of the land in controversy remained in the United States until the Patent issued, which was in the year 1820, the time Easton paid for the land. That before that time any conveyance from Dunnegan to Bates, (and

which is relied upon by the complainants as notice to the defendants in error,) placed on the records of Madison county, was no notice to either Easton, Russell, or Hunter. The legislature had no authority to make a conveyance of a purchaser's right to public lands under the credit system, notice, until the title had first passed out of the government; and that an assignment of such right to make it notice to either Easton, Russell, or Hunter, should have been filed in the land office where the land was entered, and not in the recorder's office in Madison county, where Bates' deed from Dunnegan was recorded. 2 Public Laws, &c. 231, 232, No. 170; Ib. 14, 15, No. 13; 15 Peters, 110, 111, 113; 13 do. 439; *Davenport* v. *Farrar*, 1 Scam. 317.

VII. We insist that a purchaser from one to whom a Patent has issued by the United States, has a right to conclude that all the prerequisites of the law have been *bona fide* complied with; and that he is not required to look behind the Patent for latent equities. But on the contrary, the Patent being the superior and paramount title, those purchasing under it are protected against any *latent equities* that may be supposed to have existed previous to the issuing of the Patent. 13 Peters, 450; 4 Peters' Cond. R. 657; 8 do. 528; 6 do. 357. As to Hunter, *Bell* v. *Duncan*, 11 Ohio, 192. He is also protected being a *bona fide* purchaser from Russell, who had no notice of any latent equity in the land in controversy. That in addition to this he also derives title through Gamble, who is not charged with notice of any equity between Easton and Bates; as also through Meacham and Bates, he, Hunter, having released his land from Meacham's mortgage to Bates by paying the administrator of Bates the value of the lots claimed by Hunter. 2 Powell on Mort.' 665, and note C.; Ib. 667; Toller on Ex. 182, 185.

The Opinion of the Court was delivered by

Lockwood, J. The appellants filed their bill in the Madison Circuit Court, in November, 1841, and an amended bill in May, 1842, for the purpose of obtaining a decree of that Court, requiring the defendants to surrender up to complain-

ants, all their right and claim to the North West fractional quarter of section thirteen (13), township five (5) north, in range ten (10) west of the third principal meridian. The prayer of the bill also asked that defendants be required to deliver possession of said tract to complainants, and account for the rents and profits of the land. The original bill required the answers to be put in on oath, but the amended bill dispensed with the oaths of the defendants to their answers. The answers of the defendants were filed in September, 1842, and were sworn to.

The cause was heard on bill, answers, depositions and exhibits, and a final decree rendered at the November term 1843, denying the prayer of the bill, and dismissing it with costs to be paid by complainants. From this decree, they have appealed to this Court.

It appears from the facts in the case, that on the 19th day of August, 1814, an entry was made, in the name of Andry Dunnegan, in the land office of the United States at Kaskaskia, of several tracts of land, among which was the North West fractional quarter of section thirteen (13), township five (5) north in range ten (10) west, being the tract claimed by complainants, and containing in all, five hundred, thirty two, and fifty one one hundreths acres. The price of the land was two dollars per acre, making the full purchase money of the whole $1065·02. With a certificate of a confirmed unlocated claim of Davis Dubois for two hundred acres, payment in full was made for two hundred acres of the tracts above mentioned, which left the residue, amounting to $665·02, to be paid in money. One fourth of this sum was paid down, and a certificate was obtained from the land office, setting forth these facts, and stating that upon the payment of the remaining three fourths by annual instalments, the last of which was to be paid on or before the 19th day of August, 1818, a Patent would issue to Andry Dunnegan, or his assignee, or other legal representatives, for all the tracts of land mentioned in said certificate.

On the 10th day of October, 1814, Dunnegan and wife conveyed by deed in fee simple to one John Bates, the North

West fractional quarter of section thirteen (13), township five (5) north, range ten (10) west, being one of the tracts of land mentioned in said certificate. The consideration mentioned in the deed is $228. This deed was acknowledged and recorded in the recorder's office of Madison county, being the county in which the tract of land is situated, on the 28th day of February, 1815. The complainant, Betsy Moore, claims under this deed, as sole heir at law of John Bates deceased.

On the 25th day of December, 1817, Andry Dunnegan assigned the certificate of purchase issued by the land office at Kaskaskia, as before stated to Rufus Easton, and acknowledged the same before a justice of the peace in the manner prescribed by the laws of Congress, in consideration of five dollars. The time of payment having been extended by Congress, it appears by a certificate issued by the register of the land office at Kaskaskia, that Rufus Easton, on the 31st day of March, 1820, made final payment for the whole of the tracts embraced in the certificate of purchase aforesaid by paying into the said land office, $442·78½ being the amount of the second, third and fourth instalments mentioned in said certificate, and also $149·22 for interest due on said instalments, and obtained a Patent in his own name, as assignee of Andry Dunnegan, which Patent was issued on the 16th of June, 1820. The defendants claim title under this Patent. These are the two principal chains of title, to wit, the complainants' chain under the conveyance of Dunnegan to John Bates, and the defendants' chain under the Patent to Rufus Easton.

It further appears from the facts of the case, that John Bates and wife, on the 2d day of March, 1818, conveyed the tract of land in dispute to one Joseph Meacham for $3800, and Meacham mortgaged the same land back to Bates to secure the payment of the purchase money, and both were recorded March 10, 1819. In July, 1818, Bates entered into a written contract with Meacham to release and discharge from the operation of the said mortgage, all purchases under Meacham, upon Meacham or the purchaser paying to Bates a

Moore *et ux.* *v.* Hunter *et al.*

proportional sum of money equal to $40 per acre, for the quantity of said purchase. Bates died about the autumn of 1818, leaving an only child, Betsy, who is one of the complainants in this cause. In 1822, one Levi Crosby, as guardian of said Betsy, then an infant, foreclosed the mortgage by *scire facias,* sold the property, purchased it and procured the deed to be made in his own name. One John Scott became a purchaser under Crosby, but was compelled by a decree of the Circuit Court of Madison county, to transfer his interest in the land in dispute to complainants. Whatever title, therefore, Crosby received under the purchase aforesaid, was vested in complainants by that decree. This terminates the complainants' chain of title, to wit: *First,* entry of Dunnegan and payment of a confirmed unlocated claim and first instalment; *Second,* deed from Dunnegan and wife to Bates; *Third,* mortgage from Meacham to Bates; *Fourth,* a foreclosure of said mortgage, a purchase of the premises by Crosby, and a decree of the Circuit Court in favor of complainants, by which whatever title Bates had originally, was recovered by complainants.

The following additional facts appear as regards the defendants' chain of title, to wit: In 1822, and after the Patent was issued to Easton, Archibald Gamble purchased all of the land mentioned in the Patent, except whatever claim or right C. W. Hunter may have to said fractional section, either in law or equity, at sheriff's sale under an execution issued out of the Circuit Court of Madison county against Easton, and received a sheriff's deed therefor. Easton, in 1825, conveyed by quitclaim all the lands mentioned in said Patent to Russell, one of the defendants. Gamble also, in 1826, by quitclaim deed, conveyed to Russell all the land mentioned in said Patent, but referring to the sheriff's deed aforesaid as his source of title. By virtue of these conveyances, Russell claims title to all the lands described in said Patent, with the exception of such portions of said lands as he had sold and conveyed to other persons.

In 1835, Russell conveyed by quitclaim deed a number of lots to Hunter, the other defendant, being part of the prem-

ises in controversy. Hunter, also, in November, 1818, pur-
chased by deed a number of lots of said land from Meacham,
and procured on the 31st of August, 1821, a release, as to
these lots, from the administrator of Bates, in accordance
with the written agreement between Bates and Meacham.

The foregoing statement contains a concise view of the
paper title of the respective parties to this controversy.

After a lapse of about twenty five years, it is extremely
difficult to explain with reasonable certainty an involved
transaction of this nature from the recollection of witnesses.

The depositions are, therefore, what might be expected in
such a case, very unsatisfactory, and calculated rather to cre-
ate doubt and hesitation, than conviction, in a cautious mind.
Dunnegan, who must have been old when his deposition was
taken, seems to have forgotten many of the most important
circumstances of the transaction, and to retain but a con-
fused recollection of others. What he recollects and testifies
to, is substantially as follows: That he made an improvement
on the tract of land in dispute, left it in 1811, and sold it to
one Ellis for a mere trifle; that Bates got into possession of it
after Ellis, and that he, Dunnegan, assigned his good will in
it to Bates, without receiving any consideration from him;
that he did not understand that the writing he gave to Bates
was a deed; that he never entered any land in Madison coun-
ty, and never paid any money to the United States for any
land in that county. He further stated that he did not know
Easton, and had no recollection of ever having assigned the
certificate of purchase to him.

Abel Moore, one of the complainants' witnesses, says that
he knew Dunnegan in 1808, when he lived on the land; that
he sold his improvement to Ellis, and that Bates afterwards
got into possession of it, and lived on it until he died in 1818.
Moore also says that Dunnegan left the land in 1811, and
was always poor and with little property. This is also cor-
roborated by Jacob Deck. I think, then, we are authorized
to conclude that Dunnegan never entered or paid for any
part of said tract of land, and that his name was merely used
to enable some other person to make the entry, which was

very common at that time.  He was obviously a poor man, and had he made so important a purchase, he would have remembered it.  His assignment of the original certificate of entry to Easton, expressing only the nominal consideration of five dollars, shows conclusively that his name was merely used.

The next inquiry is, to ascertain who made the entry.  This can only be ascertained from circumstances.  Easton procured Dunnegan to assign the certificate of purchase to him.  This fact shows that the certificate was in the possession of Easton.  The certificate from the land office, dated 31st of March, 1820, shows that Easton paid up the three last instalments, in the name of Dunnegan, and procured the Patent to be issued in his own name.  If he paid the three last instalments in Dunnegan's name, it seems reasonable to infer, that he paid the first also.  It is further shown by the depositions of James W. Whitney and Joseph Bartlett, that Easton was a lawyer, and practised in St. Louis, and in Madison and St. Clair counties; had been a delegate in Congress, and Attorney General in Missouri.  Both say that he speculated in lands in Missouri and Illinois.  Whitney says he was extensively engaged in purchasing New Madrid and Spanish claims in Missouri; and Bartlett says that he had a great many floating claims.  Bartlett says further, that Easton entered a tract of land in his name in Madison county, under his pre-emption right; and that he afterwards conveyed part of the land thus entered in his name to Easton, and the remainder to Nicholas Jarrot at Easton's request.  These additional facts and circumstances raise an almost irresistible presumption that Easton made the entry of the land in controversy, furnished the certificate of Dubois' unlocated claim, and the first instalment of money, and that, from first to last, he merely used the name of Dunnegan to procure a title to the land, under the peculiar land laws of Congress then in force.  If, then, Easton made the entry and paid for the whole of the lands mentioned in the original certificate, amounting to upwards of five hundred acres, and procured a Patent in his own name, from the United States, his title was

good in law and equity. Russell having obtained deeds from Easton, and from Gamble, for all the lands mentioned in the Patent, must necessarily have an indefeasible estate in them. Dunnegan having no interest in the land, conveyed nothing by his deed to Bates, and the conveyance he made was only, as he says in his deposition, of the good will of the land, for which he received nothing from Bates. This disposes of the case as set forth in the bill. But as some of the depositions indicate a state of case entirely different from that set out in the bill by the complainants, equally favorable to their claim, the ground upon which it is said the equity of the case rests, has been shifted; and it is insisted that instead of Dunnegan, Bates advanced the money to make the entry, and that, although the entry was made by Easton, yet it was made with money advanced by Bates, and being so made, Easton held the legal title in trust for Bates.

It is further insisted by complainants, that the defendants are purchasers with notice, and are bound in equity to perform the trust and convey to complainants. Notwithstanding it is a well settled rule in chancery, that the allegations in the bill and the proof must correspond, yet I will proceed to inquire whether the depositions in the case make out such an equity as to give a right to complainants to call for a surrender by defendants of their legal title. The grounds of equity, based upon the depositions of the witnesses, depend upon a number of contingent and very doubtful circumstances. A Court of Equity ought to be fully convinced by clear and incontrovertible testimony, before they subvert a long standing legal title, accompanied by possession. The random recollections of one or two witnesses of some expressions dropped casually by the original purchaser, between twenty three and thirty years ago, ought not to be the basis of destroying a regular legal title, derived from the Government. The common assurances of the country, the legal evidence of title to real estate would be of little value, if they could be thus shaken.

I will now set forth the evidence upon which this claim is based. John Pruit testifies, that he was at the house of one

Beeman, when Easton and Meacham came there and they proposed to Beeman to save his land by paying them the money, and they would save him the trouble of going to Kaskaskia to enter it; and they went, one or the other of them, Easton appearing to be the principal, and he stated that Bates had furnished him the money in silver to secure his, Bates' land in the same way, and that he, Easton, was to secure Bates' right to him in the land, now in question, on which Bates lived at the time witness spoke of. Pruit further stated, that he could not tell the year he heard this conversation, but thinks it was probably in the year 1815 or 1816, but cannot be positive. He further stated that he could not tell the exact amount of money Easton said he had received of Bates; he, however, saw the money and it looked as if there might be two hundred dollars, from the bulk, and Easton stated it was the money he had received from Bates to save his land for him. Witness also understood that Easton was to enter the land in the name of, and for Bates. Whitney also testifies, that he had a conversation with Easton in the winter or spring of 1820, about the tract of land in controversy; that he informed Easton that he understood he owned the tract of land in question; that he, Whitney, wanted to purchase one, or more town lots off of it; that Easton replied that the land aforesaid was transferred to.him, and the particulars about it, but which the witness did not then recollect; that Easton further informed witness, that the Patent had been, or would be issued in his name, but said that the interest in the land belonged, notwithstanding the transfer, to John Bates. Witness further said that Easton might have qualified his expressions by saying the estate of John Bates. Easton also said to witness, that under the circumstances, he could not-sell witness any town lots off the quarter section aforesaid, though he expressed a willingness to oblige witness in any way in his power. Witness also testified that Easton never expressed to witness that he knew John Bates was in possession of the aforesaid tract of land, by word of mouth, but witness knew that Easton knew all about it, as well as witness, or perhaps any one else. The testimony of these two witnesses raises a

doubt, as to the person who advanced the first instalment, or the three last instalments, in payment of that particular quarter section of land; but still, it is only a doubt, and one which, owing to the neglect of parties and the lapse of time, will probably never be solved. But this doubt must be converted into something like certainty, before a Court of justice would be justified in breaking down a regular chain of title. These witnesses may have misapprehended the import of the observations made at the time, and they both admit that they do not recollect all the statements of Easton, in the respective conversations which they detail. Possibly if they could have recollected, with clearness and certainty, all that was said in these respective conversations, the effect of their testimony might be very different. But suppose it was proved to the satisfaction of the Court, that Bates advanced the whole of the money with which this tract of land in controversy was entered, and that the money thus advanced was actually applied in its purchase, still, unless both Gamble and Russell had notice of that fact, Russell would be unaffected by such an equity. The bill does not charge that Gamble had actual notice of any equity in Bates, and there is no proof that gives the slightest color to the belief, that he had any notice of any such equity in Bates. If Gamble purchased without notice of Bates' equity, Russell is protected; although he may have had notice. 1 Johns. Ch. R. 213. There is, however, no evidence that brings home to Russell any knowledge that Bates had furnished Easton any money to purchase, or enter the land in question. The Patent having issued to Easton, as assignee of Dunnegan, all that was incumbent on Russell, was to examine the land office, to ascertain whether Dunnegan had regularly transferred the certificate of entry to Easton, and if that investigation furnished no evidence, nor led to any suspicion that Bates had any claim in equity in the land, then Russell was not bound to search any where else, before he purchased. The case of *Brush* v. *Ware*, 15 Peters, 93, sustains this position. In the case of *Bell* v. *Duncan*, 11 Ohio, 192, it was held that every purchaser is presumed to have notice of any defect of

title, apparent upon the face of his Patent, but that he is not required to look for a latent defect in the chain of assignments recited in the Patent, where such assignments purport to have been made by the proper persons. The Court also held, that the Patent afforded a legal presumption that it was properly issued, if regular on its face, and upon which it was safe for subsequent purchasers to rely. A contrary rule, the Court say, would work immense injury to the holders of real estate derived from the Government, and to the public. There is nothing on the face of the Patent issued to Easton, that puts a purchaser upon any other inquiry than whether Dunnegan had regularly assigned his certificate of entry to Easton. That assignment was made, and, consequently, a purchaser from Easton is unaffected with any latent equity that may exist between Easton and others. The facts, then, proved by the depositions, and not alleged in the bill, do not furnish sufficient ground to defeat Russell's legal title.

It was strongly urged on the argument that the recording of the deed from Dunnegan to Bates, was constructive notice to all the world, that he had some title or right, either in law or equity to the land in dispute. This position I deem untenable. The United States are the owners of all the vacant lands in this State, and until they have sold and received the price stipulated to be paid for any particular tract of land belonging to them, the recording acts of this State have no application. A contrary doctrine would lead to great injustice. Until the United States have parted with their title to the public lands, no purchaser would think of seeking for equities or incumbrances affecting the title, in any other place than in those offices where the lands were subject to entry or sale. When Dunnegan executed the deed to Bates, only part of the consideration for the land had been paid, and whether the land might not revert to the United States, was altogether uncertain. To record the deed of Dunnegan was a useless act, not required by law and the record, consequently was not notice to any one. *James* v. *Morey,* 2 Cowen, 310.

Having shown that neither the deed from Dunnegan to Bates, nor the evidence that Easton received money from

Bates to enter the land can defeat Russell's legal title, it is unnecessary to say much respecting Hunter's title. As he claims under Russell, if Russell's title is good, his cannot be in a worse condition. The facts, however, show that his title is valid, as against the complainants without resorting to the title derived from Russell. The release of the administrator of Bates to Hunter is sufficient to discharge the lien of the mortgage executed by Meacham to Bates.

Another point may as well be noticed, and that is, the amended bill having waived the oaths of the defendants, we can perceive no propriety in subsequently filing answers on oath. We have, therefore, in considering this case, given no other effect to the answers than if they had not been sworn to. Upon the whole, we are of opinion that the decree below be affirmed with costs.*

TREAT, J. dissenting: I concur in the propriety of affirming so much of the decree of the Circuit Court as relates to the defendant, Hunter; but I am of the opinion, that the complainants have shown a clear right to the relief claimed against the defendant, Russell.

SCATES, and YOUNG, Justices: We concur in the dissenting opinion as expressed by Justice Treat.

*Decree affirmed.*

---

*This cause was decided at the December term 1843, but the Opinion of the Court was not delivered until the present term.

WILSON, C, J. did not hear the argument, and gave no opinion.